Good morning, Your Honors. May it please the Court. First, I would like to request a three minutes for rebuttal. Okay. One at a time. Second, regardless of the cost of deficit spending, I wanted to thank you for what just occurred. I've been in this Court, I think, four, could be five times, and you lose track. And I've never had a panel come out and shake hands, and I really appreciate that humanist approach because these cases, in their end, involve humans, and no case more than this. This involves family, with the first child, certainly the first child for the mother, and children, I think, are the heart and soul of who we are as a society. I want to turn first to the words, factual nuances, which come up in the District Court ruling, come up in the briefs, because factual nuances, even coming up and being discussed, points to the fact that the scavenger hunt that Gomes v. Wood Court described the Supreme Court as shifting away from, and two, the relevant inquiry of whether fair notice existed, that the described conduct was unconstitutional, is undermined by using the factual nuance approach. It's an avoidance of the fact that a plethora of Supreme Court law has said the facts don't have to be on all fours in order to determine that the law was clearly established. I think we did a yeoman's job in the brief of describing the Rogers Court decision. It starts on page 15 of our opening brief. And how the Rogers Court, through citing three other cases, Calabretta, Wallace, and Mabe, was able to clearly decide that it was clearly established that if there's a time element in which you can receive your warrant, then you don't have exigency. And that's kind of separate, apart from the question of the seriousness or the risk of serious bodily injury. Words that, while quoted because they had to be in Appelli's brief, are, other than that, other than citing it as something a court said, are avoided and colored with adjectives like, this child is extremely fragile. They make it sound like this child was going to pass away when walking from the hospital, but the child had been discharged from the hospital. Just a second. Can I ask you a couple questions? There are some facts that were outlined that Dickerson provided 15 reasons she believed that A.M. was in imminent danger, right? There were 15 different reasons? There is, in the current posturing and the deposition, it was nine. Okay. It grew. Are there any questions about any of those particular facts that are disputed? They are disputed in some sense. Like, they talk about the repeated use of marijuana. They talk about where car seats are and things like that, which are of no relevance to ‑‑ Well, it seems to me that one disputed is when Dickerson learned of the charge. Learned of the charge? Oh, excuse me, of the discharge on the morning. When did Dickerson learn of the discharge? Well, I think what you're referring to is when did she decide to remove the child, because learning of the discharge would really, if you think about it, be of no consequence to the exigency analysis. Well, I guess that's why I'm after that fact. It seems to me that one could easily say that once Dickerson learns of a discharge, one should know. Well, first of all, I don't think Dickerson would have been too concerned while the child was in the hospital, but the discharge would put the child someplace else. And therefore, learning of the discharge, if there were an exigent circumstances, if you will, then one could do something, but if one has time to go get the warrant, one ought to go get the warrant. One ought to go get the judge, not just say, well, we're going to take the child. So it seems somewhat worrisome to me that if she knew about this discharge a day before, she should have gone and got a warrant, or at least that's a question of fact. It is a question of fact. We did provide you with the detention report in which she cites to the parents that they're going to go to a detention hearing on the 9th. So in a sense, regardless of the discharge, she had made the decision to remove the child. And I do want you to know, it didn't come up, but I'll submit to you, that they take protective custody of children in hospitals all the time. You could go to that court. You could have gone there on the 6th or the 7th to the juvenile court and gotten your warrant apparently in 8 to 24 hours, depending who you want to believe from the city's side. So the discharge itself. I understand that, but I guess it seems to me that what we have argued to us is you had enough time to go get a warrant. And I look at what Phillips says, and I'm only looking at Mikich's version of the facts. Phillips says decision was made before or during the meeting on December 9th. Correct. The TDM report indicates Dickerson and Phillips knew on December 9th that the hospital would discharge A.M. on December 10th. Correct. Bell says the shortest time she had heard of to get a warrant was 8 to 9 hours. Seems to me that that lays pretty much a disputed issue of fact at best. And if I take what the plaintiff suggests is true, which I must do on this, I don't know how you can give, how you can say that there wasn't a violation of a constitutional right because you could have got a warrant and you didn't. Then we are in perfect agreement as plaintiff's counsel. I understand, but I'm just trying to make sure that that's where you are because that's what I want to do with him. I want to make sure. In about 45 seconds, I'm going to let you do with him as you will. All right. I just want to point out to the Court that they probably will make the argument there's nothing about babies in terms of prior case law, but it's that kind of parsing that just throws out the idea that escapes from liability are an exception, that the exception swallows the rule. And there was nothing in these facts that they tell you. I know they say this baby could have died, but that's true of anyone. That's true of anyone at all. And these parents had gone to the hospital, had sought the medical care. Mother was in that hospital. She breastfed that baby. That baby was born with a 9 in the APGAR scores. And within a short period of time, she was ready to be discharged. Come back and check her out in three days. So are there any other facts, because I'm trying to put all these facts in line given what we have, that I ought to rely upon besides those that would make it such that this was a violation? No, because I believe the facts, even as they argue them, again, the expanded 15 version from the 9, indicate that there was not an immediate risk of serious bodily injury, something that in Rogers the court has an emphatic statement. I'm kind of upset I didn't have it in the brief, but they say as emphatically as the Ninth Circuit I think can say things, we have said repeatedly that there has to be an imminent risk of serious bodily injury. That's the problem here. The baby was under white. The couple was homeless. So if the baby, and they were concerned, if they wanted to make sure that they could get the baby before the baby went, they didn't know where the baby was going to go, and they had information that the baby might not be cared for properly, and the baby was imminent when they got that information that they were about to be discharged, do you still say that they had to go get a warrant? Yes, they had to go get a warrant. And the two first points that you made, that the child was underweight and homeless, those were true on December 2nd, when the child was born. No, I'm saying you. My point being. So it doesn't matter when they knew that the baby was going to be, when they found out that the baby was about to be discharged? I don't think so if their argument is that circumstances were exigent. If those circumstances were exigent, they were exigent on the 2nd, 3rd, 4th, 5th, 6th, 7th, 8th. And if it's an eight-hour window to get a warrant, then I don't know how many times over could they have gotten a warrant. And, again, the child was underweight when birth, when born, with nine APGARs. I'm assuming the Court has some familiarity with APGARs. And then did nothing but get better. Nothing but get better, right to the end, until the parents should have been walking out the door with their newborn and very excited about it. Is there anything material to this idea about being in a home or having a home that is relevant to what we should take into consideration? California legislature said it isn't. California legislature said you don't get to take people's children because they're homeless. Did you notice in the brief where they point out that I paid for them to get a hotel? If I can do it, cannot the entire agency start, instead of on the second day of involvement looking for foster care, start looking for housing assistance? Isn't that what they're supposed to do? Many social workers would stand right here and tell you that is what they're supposed to do. They're supposed to keep people together, families together. Now, the Court went off on newborn. Yes, they did. That newborn was a different particular circumstance for this case. What is your response to that, that this probably is more important than to take the child into custody? Whether more important or not, I think the law was clearly established, as we described in the Rogers and the cases lead up to it, to give you fair notice that your conduct will be unconstitutional. The exigency or the removal or the choice of what you do, the scope of intrusion that you choose to enact, has to be circumscribed by the exigency. So certainly by the time this child is discharged, healthy, no medication, I don't know if the Court saw the list of things, a well female, just small for her age, no medications, all that. How can we say newborn or not, six years old or four years old or newborn, that this child is facing some type of imminent risk of serious bodily injury from anything, and certainly not from homelessness? I went into deficit spending. You did, but my question put you there. May it please the Court. Good afternoon. Joshua White on behalf of appellees. Ms. Dickerson conducted a thorough investigation and reached the only conclusion that any reasonable social worker could have reached under these circumstances. Why didn't she get a warrant sooner? As I understand it, that's really the focus here, or try to get one. Sure. I think there are a couple of questions. One is this question of when was the final decision made to remove the child. Was it December 9th or December 10th? Aren't there two different things that Ms. Dickerson said, one in a deposition and one in a declaration on that topic? What Ms. Dickerson said, and, in fact, I think the facts are undisputed on this point. Sure, the point of the TDM is to get everyone in a room together and to allow the social worker to share their concerns with the parents. And on December 9th at the TDM, what the social worker, Ms. Dickerson, communicated to the parents was that the child will be removed from your custody unless you can make a demonstration that you have a safe place to go and the necessary supplies. So what Ms. — so everyone with respect to that TDM, Ms. Dickerson, Mr. Phillips, and both of the plaintiffs, they all testified that once the TDM ended, the ball was in the court of the Mikitches to do the things that the social workers had laid out in order to go home with the child. Go ahead. You're on your way, and I don't want to interrupt you. Go ahead. Let's say there's deposition testimony that the decision to remove was made prior to the TDM. Then would that, in your mind, support a tribal issue of fact that would preclude summary judgment? No, Your Honor. And I think the reason comes back to qualified immunity, and I can get to that in a moment. I mean, first I would like to say, if you're referring to the deposition testimony of Mr. Phillips, it has to be taken in context. He said that the decision was made on December 9th, but later in his deposition when he's asked, look, if the Mikitches had demonstrated after the TDM that they had a safe place to take the child, would the child have been returned to the Mikitches' custody? And he basically said, yes. As long as they had allowed an inspection of the place that they planned to go and that was a safe place, then they could have gone home with the child. So throughout the time that the Mikitches' newborn was in the hospital, Ms. Dickerson kept communicating to them that the ball was in their court, and Ms. Dickerson simply cannot go to juvenile court and try to get a conditional warrant to basically go to the juvenile court and say, look, this child is going to be discharged at some date in the future. There are things that the parents can do in order to take custody of their child once the child is discharged. However, we at CPS are simply not confident that they're going to do those things, and therefore we would like you to remove the child. I'm sure you're taking your ball off the real question. It seems to me that you're just providing the defenses. What we have to do here, that's why I wanted him to make sure there wasn't more he wanted to pile on to what I had. Aren't we really looking here at what do they allege and what is there in the record that they can present? And whatever you present is out. To the contrary, notwithstanding, too bad. You might have it when you get to trial, but not here. And so what we had was Phillips says the decision was made long before. The TDM report suggests it was made long before, well, a day before. And Bell says the shortest time to get a warrant is eight to nine hours. So with that, and that's why I wanted to see if he wanted to pile more on so you could address it. With that testimony, I'm having a tough time understanding how I can, as a matter of law, say you couldn't have got a warrant. You can argue, well, it was all on their problem. But if, in fact, the decision was made on December 9th, it did not fall on them. If, in fact, that's what the TD report said, TDM report said, didn't fall on them. If, in fact, Bell, who was your Rule 30 expert, says you can do it in eight to nine hours, it seems to me you should have got your warrant. There are a couple of points, and I'd like to move on to qualified immunity because I think even if the court concludes that the decision was made on December 9th, I think Ms. Dickerson and Mr. Phillips are still entitled to qualified immunity. The first is what the TDM action report says is that there are a couple of different options that may occur after the TDM. One is foster parents. One is biological parents. So it was a contingent decision. Mr. Mikic testified at the deposition that he knew, and he began to consider the option of a homeless shelter at the end of the TDM, as did Alexis, as did Mr. Phillips, as did Ms. Dickerson. So all of the testimony is that, sure, a decision was made on December 9th that the child will be removed unless the Mikic's do certain things. But let me take a moment to kind of move on to qualified immunity. All right. So I think it's important, and this is something that we tried to emphasize in our brief, which is that the point of qualified immunity is that a government official is shielded from liability unless the case law at the time that they made the decision put them on fair notice that the decision that they were about to make was unconstitutional. And, in fact, in Stanton v. Sims recently in 2013, the Supreme Court said that there's qualified immunity even if or unless the decision of the government official was plainly incompetent in light of the existing law. And so the case. So distinguished Wallace, distinguished Rogers, and distinguished Mueller, which I think say in these circumstances you know you're supposed to get a warrant if they're non-exigent circumstances at the time. If you've already decided you're going to take the child, maybe you better go see the court. Well, I think Rogers, all of those cases, first of all, did not involve newborns in hospitals. And the Supreme Court has cautioned over and over again, and specifically the circuit, that defining the right in those abstract terms is simply not sufficient for qualified immunity. I don't believe that. Mueller was a newborn. Well, I think what happened here was the fact that- I mean, I was on Mueller. Okay. I know exactly. It wasn't basically newborn, but it was a small baby who just barely got fever and had to come back. So I don't see it much different. Well, I think the way that, for example, like in the Barnes case, the court defined qualified immunity is instructive. And what the court in Barnes said was, you know, there was a circumstance in which a child was in the custody of two parents. One of those parents was abusive and was on his way to pick the child up from school. And what the court said was it was not clearly established that in that circumstance CPS can remove the child versus calling the non-abusing parent. And so here the circumstances- It's dead on what we used to call the spotted cow case. It's the law's not-what is the law that's not clearly established here? It was not clearly established that in this circumstance, Ms. Dickerson-let's assume that the decision was made at the TDM. It was not clearly established that a social worker in that circumstance needs to go to court and try to seek a conditional warrant. As this Court will recognize, courts don't grant conditional warrants. A social worker cannot go to court and say, here are the reasons why we believe this child is in immediate danger. The child is not ready for discharge. And as long as-but the parents can still leave the hospital. The child wasn't not ready for discharge. The child was ready for discharge the next day. This isn't conditional. I mean, that's the thing that you continue to put into this. But that assumes the government's facts. The plaintiff's facts are, you knew this kid was getting discharged tomorrow. There was no question you were not letting this kid go home with its parents. You should have gone to see the judge. Your Honor, even assuming that the decision was made on December 9th, it still would have been a conditional warrant because-oh, I'm sorry. Go ahead, Your Honor. Finish your sentence. Okay, sorry. It would have been a conditional warrant because Ms. Dickerson-so the TDM occurs and ends at 3.30 on a Thursday. If Ms. Dickerson goes to court and says, we would like custody of this child, but if the parents do the things that we laid out for them at the TDM, then they'll get to go home with the child. But if they don't do the things that were laid out in the TDM, then the State gets to keep custody of the child. There is no way that a dependency court issues these sorts of contingency warrants, nor was it clearly established to the judge. The plaintiff's facts do not suggest, as I understand it, unless you can tell me where I'm wrong, that there was any question on the night the child was going to be taken. It wasn't a matter of what the parents did to get rid of it. It wasn't a matter of any of those. It was the emergency existed, and they were taking the child. Your Honor, I would direct you to page 135 in the excerpt of record. That's where Mr. Mickich testifies that he knew at the end of the TDM that he needed to start looking for a homeless shelter. So he knew that that was contingent. Page 89 of the supplemental excerpt of record, Alexis Mickich testifies that she knew that there were things that they could do to go home with the child. Mr. Phillips, on page 254 of the supplemental excerpt of record, testified that if they did these certain things, they would have had custody returned to them. So the idea that there was nothing that the Mickichs could do after the TDM ended on December 9th is contradicted by the testimony of all four of the people. I take it it's your position that you thought that they might go to a homeless shelter immediately, and if they did that, then you wouldn't take the child? Sure, or if they had decided. In these TDMs, what happens frequently is everyone's in a room, everyone's looking at each other, and CPS lays out the case and says these are the things you need to do. Most parents, many parents, will actually do those things. So whereas up until that time the Mickichs had been refusing to allow a home assessment, sitting in a room with the social workers and saying that your child may be removed unless you do these things, that causes a lot of people to change their mind. And it's just, it certainly was not clearly established for qualified immunity purposes that when a social worker says to parents, these are the things that you need to do to be able to go home with your child, that nonetheless the social worker has to assume that the parents won't do them and try to seek a warrant. That is an untenable position for social workers to be in. Thank you. Your time has expired. Thank you, Your Honor. Counselor, I'll give you, I think you need to respond to this conditional warrant idea, and so I'll give you 30 seconds. Could I beseech the court for maybe 90? All right, well, we'll see. 30 seconds. Go ahead. Conditional warrant. No such thing. Ask for a warrant. They put children on protective custody holds all the time. It's done daily. TDMs. I've been to them. They're a one-sided room. Parents come in, they have no representation. They will not allow lawyers to attend. You're surrounded by CPS when you get there. But let me point out what I think is the most poignant thing about this. We've got these people who they say are poor and homeless. We don't dispute that. So they actually did have a place to live. They just wouldn't let them go and check it out. So they're poor. That's not disputed. And what do they say? What are they saying now? This agency that's supposed to help people in these circumstances? The ball's in your court. The ball's in your court. They don't need to help me. They need to help the Mikitches. They need to help the other people who are out there struggling and having children. Give them the services that they have. The Phillips change in testimony, we laid that out. Sure, he came back from a break. Maybe he had something to eat, something to drink. It's testimony. If they in good faith thought that you were going to go to a homeless shelter with the baby. If they had a good faith belief, is that your question? Yes. Then? Then what should they have done? They should have left the baby in the care of the parents and let them go to their father's house for however long it took to get in a homeless shelter and left this family intact. And you know what? These parents didn't tell these social workers, get out of our lives, stay away from us. They didn't do any of that. You could have worked with this family. But what happened? Bottom line, Bonnie Dickerson was upset because you won't agree with me and let me go to your house. We call it in my business, in the plaintiff's bar, which there's only about 10 of us in the state, we call it contempt of social worker. And that's what the case came down to aside from the legal ramifications. Thank you for your time. Thank you both for your good arguments. We appreciate both of them. Case 1315535, Mickage v. City and County of San Francisco.
judges: Gleason, Schroeder, Smith